IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2022 Session

## WILLIAM CARL GODFREY v. STATE OF TENNESSEE

Appeal from the Criminal Court for Sumner County
Nos. 2020-CR-318, 2019-CR-277     Dee David Gay, Judge
_____

### No. M2021-00768-CCA-R3-PC
_____

Petitioner, William Carl Godfrey, initially agreed to plead guilty to domestic aggravated assault, resisting arrest, and vandalism under $1000.  During the plea submission hearing, Petitioner stated that he was not guilty.  The State then offered to accept a plea of "no contest," and after discussion with trial counsel and the trial court, Petitioner accepted the no contest plea.  The trial court imposed an effective sentence of six years' probation.  On appeal, Petitioner argues that he was denied the effective assistance of counsel and that his plea was unknowing and involuntary.  After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Cayley J. Turrin, Brentwood, Tennessee, for the appellant, William Carl Godfrey.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Ray Whitley, District Attorney General; and Kathryn Brown Walker, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Plea Submission Hearing*

At the plea submission hearing, the trial court asked Petitioner a series of questions about trial counsel's representation and Petitioner's understanding of the guilty plea.  It explained Petitioner's rights and that the plea meant that Petitioner was relinquishing those rights.  The following exchange then occurred:

THE COURT: Do you have any questions?

[PETITIONER]: Just about do I have to register like domestic --

[TRIAL COUNSEL]: You're going to be given a notice that possession of a firearm after this -- after you enter this plea would be a violation of federal law, and that's what these documents are giving you notice of.

THE COURT: Basically you're signing that you got notice that you know you cannot possess a firearm or it's a violation of the law. Also, you'll be given a form that you bring to the first appointment with probation where you agree to dispossess yourself of any weapons and show proof of that by having it notarized.

The State then presented the following factual basis for the plea:

[O]n November 24th of 2018, officers responded to a domestic call in Hendersonville, and they spoke with the wife of [Petitioner, Heather Godfrey,] who said that there was an argument about a firearm, that [Petitioner] did have a firearm and he was making threats -- not directly to her, but he was making threats to other people. She said that she tried to get the gun away from him and couldn't do that, and then she ran and locked herself in a bedroom because she was afraid of what he might do.

The police attempted to arrest him, gave him commands, which he did not comply with initially, and they had to -- they were eventually able to detain him and put him in the police patrol car, but he kicked the window causing damage.

The trial court asked Petitioner if he was "guilty of these crimes[,]" and Petitioner said, "No." The following exchange then occurred:

[TRIAL COUNSEL]: You and I have gone over the facts that the State has to prove and the proof that the State would present; correct?

[PETITIONER]: Correct.

[TRIAL COUNSEL]: Based on the State's proof, it's my advice to you that you would be convicted of aggravated domestic assault.

- 2 -

[PETITIONER]: I was protecting my family. That's all I'm saying.

[TRIAL COUNSEL]: Do you want to enter this plea?

[PETITIONER]: Yes.

[TRIAL COUNSEL]: Do you understand that based on the facts and the State's proof, that you would be found guilty of aggravated domestic assault? Do you understand that?

[PETITIONER]: Yes.

. . . .

[TRIAL COUNSEL]: Okay. And do you agree that you would be found guilty of the charge of resisting arrest?

[PETITIONER]: Yes.

[TRIAL COUNSEL]: And do you agree that based on the State's proof you would be found guilty of the charge of vandalism as charged?

[PETITIONER]: Yes.

[TRIAL COUNSEL]: And do you want to enter this plea as charged?

[PETITIONER]: Yes.

[TRIAL COUNSEL]: Okay.

THE COURT: [Petitioner], I don't want to butt in here, and [trial counsel] has done an excellent job in representing you and getting you through this, but I notice that you're upset and I don't want you to be upset. We don't want to force you to do anything. What seems to be the situation?

[PETITIONER]: I called the authorities that night and it turned it into this.

THE COURT: Sometimes that happens. If you want to set your case for trial, you can do that. Your attorney is very experienced and has given you advice. I'll do what you want to do, but you're going to have to tell me what you want to do.

[PETITIONER]: I'm trying to tell the truth.

At this point, the State offered to accept a plea of no contest in lieu of a guilty plea. Trial counsel explained to Petitioner:

The State would accept a no contest. Do you understand that? The State would accept a plea of no contest for these charges; that is, that you're not contesting that you would be found guilty of something or that you have exposure. It has the same effect as a guilty plea, but you wouldn't be pleading guilty; you would be not contesting the State's proof as regards to these charges.

The trial court also explained the no contest plea:

THE COURT: [Petitioner], this means that you really don't contest the facts here and the difference is that this plea cannot be used against you in a civil matter. Do you understand? Do you enter a no contest plea to these facts?

[PETITIONER]: (Witness nods.)

THE COURT: Alright, sir. I accept your no contest plea and impose this sentence. I wish you well.

Pursuant to the plea agreement, the trial court sentenced Petitioner to an effective six-year sentence with a thirty percent release eligibility,[1] which was suspended to probation. Approximately eleven months later, the trial court issued two violation of probation warrants, which stated that Petitioner violated the conditions of probation by testing positive for marijuana and by "harassing and intimidating his former defense attorney[.]"[2]

Petitioner filed a timely pro se Petition for Post-Conviction Relief and an amended petition through counsel.

---

[1] The judgment forms do not appear in the record, but the trial court explained the sentence at the plea submission hearing.

[2] The probation violation warrants appear in the record. The transcript of the post-conviction hearing reflects that there was a hearing on the probation violations in May 2020, and that the trial court released Petitioner on his own recognizance on June 5, 2020.

Petitioner testified that, prior to the offenses in the present case, he had convictions for vandalism and possession of marijuana. He said that he first retained trial counsel about a week after the offenses. Petitioner recalled explaining to trial counsel:

I called 911 about my phone missing because the last time I recalled the sheriff stopped [] at my house and dropped off my drunk neighbor I kicked off the property. . . . I told [trial counsel] the whole context of the 911 call and the 911 dispatcher not deescalating the situation but threatening to send police over for domestic aggravated assault. . . . About my wife getting scared because of the person on the other line threatening to bring the police over with lethal force.

Petitioner stated that he never went over discovery with trial counsel except for a "brief report" from the police. He said that he asked trial counsel to subpoena the 911 call recording but that trial counsel did not obtain it and did not say why. Petitioner said that, prior to the plea submission hearing, no one had explained what a "no contest" plea was. The following exchange occurred:

THE COURT: Do you remember me explaining it to you?

[PETITIONER]: Not offhand. I mean, I was –

THE COURT: I mean, you were here close as I am to you. I explained it to you. Were you under the influence?

[PETITIONER]: No, sir.

THE COURT: Okay. So then I go through a whole list of things on a colloquy for a guilty plea and I explained it to you. You never asked a question, did you? I explained it to you. You never asked a question.

[PETITIONER]: I think what my understanding was is that I entered a not guilty.

THE COURT: No, sir. No, sir. That's not what's borne out here. You did not enter a guilty plea. That's correct. You entered a no contest plea. It has the same effect as a guilty plea or a guilty verdict. It has the same context but it cannot be used against you in a civil matter. You didn't -- don't remember me telling you that?

[PETITIONER]: Yeah, you told me that, but I don't know if I really understood it.

Petitioner testified that trial counsel never explained that it would be a violation of state law for him to own a firearm after he pled no contest. He said that trial counsel never explained that his no contest plea would "show up" as a guilty plea on his record. Petitioner explained that he would not have pled no contest if he knew there would be a felony conviction on his record. He stated that he first realized the implications of the no contest plea when he lost his job because the conviction "was on [his] background."

Petitioner recalled that he felt "forced" to accept the no contest plea and that he did not believe he was guilty of aggravated assault. When asked if he indicated "with head movements that [he] agreed with the procedure of the court[,]" Petitioner replied, "More like I was nervous and intimidated."

Petitioner said that trial counsel's opinion that he would be convicted by a jury influenced his decision to take a plea. He stated that he did not know that the plea he entered could be used in the future to increase the punishment against him for any other offenses.

On cross-examination, Petitioner testified that, the night of the offenses, he only had one beer and that he was the one who called 911. Petitioner then read from the transcript of the 911 call where he talked about the sheriff's deputies allegedly taking his wallet:

So why were they here? So get the f*ck out here and get them here and return my sh*t because this was never supposed to be on anyone's accord -- this was not even done on my property. They robbed me. So basically when they come back, I'm just going to pump them full of a gut of buckshot. Okay? Alright.

Petitioner explained that he was asking the 911 dispatcher to send a deputy back to his residence "so I can at least have him provide me with some help to find my wallet."

Petitioner agreed that he felt pressured to take a plea, yet he also said that he thought the no contest plea meant "not guilty." Petitioner recalled that he was facing "some years" in jail time and instead received probation. He explained that he said he had no questions for the trial court regarding the plea because he was "answering under distress." He said that he was unaware that violating the terms of his probation could result in jail time. The State then listed several of Petitioner's prior convictions, and Petitioner said that he did not remember them.

- 6 -

Following a break, the post-conviction court examined Petitioner. Petitioner testified that he graduated with an Associate's degree in Science with a 3.85 grade point average (GPA). Petitioner explained that he never called the police for a "domestic aggravated assault," so the 911 recording could have helped him at trial. The post-conviction court read portions of the 911 call where Petitioner referred to the sheriff's deputies as "n*****s" and was continually swearing. The post-conviction court repeatedly asked Petitioner, "Can you tell me how that's going to help you?" The court asked, "Does that sound like somebody that's under control? Does that sound like something you want to present to the jury?" The court then stated, "So basically when [the deputies] come back, [']I'm just going to pump them full of a gut of buckshot.['] You still want the jury to hear this? You don't, do you? It's not going to help you one bit, is it?" When Petitioner did not answer the court, it stated, "You're not answering. So I assume you mean yes." The trial court continued to read portions of the plea submission hearing transcript, and after each of Petitioner's statements in the transcript, the post-conviction court stopped reading to ask if Petitioner had lied under oath at the plea submission hearing. Petitioner explained each time that he lied because he was feeling "threatened" or "pressured" or "in distress."

Trial counsel testified that, if Petitioner had wanted to go to trial and could not afford the extra cost, he would have "tried the case at a loss." He said that the State's proof against Petitioner was strong and that he told Petitioner he believed he would be convicted. Trial counsel recalled that the State finally offered a probated sentence so that Petitioner could get assistance with his drinking problem. He explained, "[I]t's my memory that Mrs. Godfrey wanted him to get help, thought that the structure of probation would give him some help with his drinking, with his anger control." Trial counsel recalled that, when the State made an offer of probation, Petitioner "expressed an interest" in working on his drinking and anger issues while on probation. He said that Petitioner never appeared to be under duress to take a plea offer. He recalled that the first time he heard concerns from Petitioner about taking the plea offer was during the plea submission hearing when Petitioner said he was not guilty.

Trial counsel said that he did not seek the 911 call recording because, "to be quite frank, I didn't want the State getting ahold of it. If I would have gotten it, there's a possibility the State would have gotten it. I didn't want that to happen[.]" Trial counsel explained:

I knew from talking to [Petitioner] what kind of shape he was in during the incident, and I knew what kind of things were being talked about, shotguns and shooting people in the stomach and paranoia and talking about booby traps with shotgun shells. You know, none of that was going to help. . . . It would have convicted him of felony assault.

- 7 -

Trial counsel explained to Petitioner that the way the sheriff's deputies responded to his 911 call saved Petitioner's life. He stated:

[A]t the time I think [Petitioner and Mrs. Godfrey] were appreciative of it. Because 911 gets a call and somebody's on the phone talking about ["]I'm going to shoot the sheriff's deputies in the stomach with a belly full of buckshot,["] most of the times if that happens, they don't respond to the scene willing to talk to the people that much. But that's not the way these deputies acted on this night. They responded and showed, I thought, great restraint and humanity in dealing with this gentleman in not hurting him.

Trial counsel said that the proof showed Petitioner was "very intoxicated" during the incident. He stated, "I've been doing this for [twenty] years and I don't think I've ever had anybody that . . . seemed as threatening to me as this gentleman did. His paranoia is almost overwhelming."

Trial counsel recalled that Petitioner came to his office about two months after the plea to ask about filing a post-conviction petition. Petitioner told trial counsel at that meeting that he was upset he could no longer have weapons. Trial counsel recalled, "The first time post plea that he came by the office, that's what it was all about, guns. I can't have a gun anymore; I can't even have a bow and arrow. That stands out. I remember that." Trial counsel told Petitioner he would need a different attorney to file a post-conviction petition.

Trial counsel recalled that, "some months later [Petitioner] came back to my office[,] and he was quite aggressive and made me concerned for what he might do, what he might do while I was there, what he might do while I was not there with my assistant there." He said that he called the District Attorney General's office and Petitioner's probation officer at that point to report that Petitioner was "threatening or harassing" him.

Trial counsel testified that he did not make any errors in Petitioner's case. He explained, "[W]hat happened was he figured out that he wasn't going to be able to have any guns anymore and wasn't going to be around guns. This is all about guns. This is about guns. He wants guns."

On cross-examination, trial counsel said that Petitioner never requested he subpoena the 911 call recording. Trial counsel stated that he believed Petitioner would have been convicted of aggravated assault for putting the victim in fear, in this case, Mrs. Godfrey. He explained that he spoke to Mrs. Godfrey and that she told him she had been afraid of Petitioner on the night of the incident. He said that he did not want Mrs. Godfrey to testify at a trial about her fear of Petitioner or about Petitioner's intoxicated state on the night of

the incident. Trial counsel said that Petitioner received a copy of everything in discovery that trial counsel received.

Trial counsel recalled that, during the first post-plea meeting with Petitioner, he did not discuss the option of withdrawing Petitioner's no contest plea. Trial counsel said that, when he called the District Attorney General and Petitioner's probation officer regarding Petitioner's threatening behavior, trial counsel was no longer representing Petitioner and had no duty to maintain confidentiality of events that happened at that point. He explained, "[I]f [Petitioner] comes to my office or my house after I'm through representing him and threatens me, he has no expectation of confidentiality or attorney-client relationship at that point." The following exchange occurred:

> [PC COUNSEL]: So before the probation violations when he would come and see you, did you still consider the communications confidential?
>
> THE COURT: Well, let me ask you this. Were you his attorney then, [trial counsel]?
>
> [TRIAL COUNSEL]: No, Your Honor.
>
> [PC COUNSEL]: Did you formally withdraw?
>
> THE COURT: There was nothing pending.
>
> [TRIAL COUNSEL]: My representation ended when the plea was entered.
>
> THE COURT: There was nothing pending at that time, ma'am.
>
> [PC COUNSEL]: Well, Judge, if he came to the office to ask questions about his case, [trial counsel] would still have to answer questions about the matters. He would still have some form of representation in my opinion.
>
> THE COURT: I disagree with you.
>
> [PC COUNSEL]: Yes, Judge. I'll move on.

Heather Godfrey testified that she had been married to Petitioner for eleven years and that he never put her in fear of bodily injury or death. She said she had never been afraid of Petitioner. Mrs. Godfrey reviewed the transcript of the 911 call from the night of the incident. She noted that Petitioner stated on the call, "I'm going to kill you now[,]" and said that that statement was directed at the deputies. Mrs. Godfrey explained that,

when she was pleading with Petitioner on the call to put down his weapon, she did so because she did not want law enforcement to hurt him. She said that, when she said she was scared on the recording, she feared for Petitioner's safety. She explained that she locked herself and her dog in the back room for safety in case the deputies started shooting. Mrs. Godfrey testified that she never told trial counsel she had been afraid of Petitioner. She said she never told trial counsel that Petitioner had a drinking problem or an anger problem.

Mrs. Godfrey said that, when she and Petitioner met with trial counsel, Petitioner asked trial counsel for the 911 recording or transcript. She recalled that trial counsel did not respond to that request and did not express concern about the State having access to the 911 call. Mrs. Godfrey said that trial counsel told them a jury trial would cost $10,000, and she said that she and Petitioner did not have that much money. She said that, because they did not have the $10,000, she and Petitioner felt like they had no choice but to accept a plea offer.

Mrs. Godfrey stated that, when they were discussing whether Petitioner would be convicted, trial counsel asked her, "Well, did you lock yourself in a room?" Mrs. Godfrey responded, "yes," and trial counsel said, "Well, there you go." Mrs. Godfrey explained, "I mean, it [seemed] that I don't get to even say what actually happened. So reading [the 911 transcript] -- if I'm cut off on that, and I can't explain the situation, then, yeah, he doesn't have a very good chance." She said that, if given the chance to read the 911 transcript and explain what had happened, she would have been able to help Petitioner's defense.

On cross-examination, the following exchange occurred:

[THE STATE]: [Y]ou had said that when [Petitioner] was heard on the [911] recording saying I will kill you, he wasn't talking about you; is that right?

[MRS.GODFREY]: Right.

[THE STATE]: Okay. I'd like for you to read then line 12 and forward.

[MRS. GODFREY]: (As read): "MRS. GODFREY: Okay. They can hear you." "MALE VOICE: Well, I'll kill them." "MRS. GODFREY: Okay." "MALE VOICE: I'm going to kill you now."

[THE STATE]: You can stop there. . . So he, in fact, made two different statements [--]

[MRS. GODFREY]: Yes.

- 10 -

[THE STATE]: right?  One, Well, I'll kill them; two, I'm going to kill you now; is that correct?

[MRS.GODFREY]: He may have said that, but that's not what he meant and I --

THE COURT: How do you know, ma'am?  You can't say what somebody else meant.  You're just spinning everything the way you want it to be.  He said, I'm going to kill you now.  Did he say that?

[MRS. GODFREY]: If it says so, but I don't think he was saying –

THE COURT: Okay.  Was he talking to you?

[MRS. GODFREY]: He was talking to the phone just as he did there, well, I'll kill them.

THE COURT: And then he says, I'm going to kill you now.  Who is the only one around him?

[MRS. GODFREY]: There's also the person on the phone, not just me.

THE COURT: Okay.  Who's the only one around him?

[MRS. GODFREY]: Me.

Upon questioning by the post-conviction court, Mrs. Godfrey testified that Petitioner "says all sorts of horrible words" when he gets upset or distressed.  She said that Petitioner had been to therapy for PTSD.  She agreed that Petitioner's conduct on the night of the incident was "extreme."

The post-conviction court made oral findings at the hearing.  It credited the testimony of trial counsel and found that Petitioner and Mrs. Godfrey were not credible.  It said that Petitioner and Mrs. Godfrey "minimize in every way that they can what happened here and what [Petitioner] did."  The post-conviction court stated:

Now, we have an issue because one month after your arrest . . . for two different [probation] violations, you file this petition for post-conviction relief.  That affects your credibility here.  You didn't have any problem until after you were arrested.  You might talk about it, but -- and I don't believe

that you say that you didn't know what probation meant.  A man of your intelligence would definitely know.

The post-conviction court found that trial counsel "showed discernment and a strategy" that "it would be a disaster for this [911] tape to fall into the hands of the State." It found that trial counsel met with and consulted both Petitioner and Mrs. Godfrey about the incident and that trial counsel "went over the elements of the crimes, the punishment for the crimes, and the evidence to be used against him, and that there was no offer than jail time."  The post-conviction court found that Petitioner "got upset" during the plea submission hearing because "[i]t's just like him to want his own way and get upset with some things that are not real important in the big scheme of things."  It found "that that is a flaw in the attitude of [Petitioner] and nothing else[.]"  The court found that trial counsel properly assisted Petitioner during the plea submission hearing and that Petitioner understood the terms of the no contest plea.  The post-conviction court stated that it thought Petitioner had assented aloud but that the transcript reflected that Petitioner nodded in assent.

The post-conviction court found that trial counsel's representation was not deficient. It stated that trial counsel "helped [Petitioner] go through that plea, and it was definitely in [Petitioner's] best interest."

Regarding Petitioner's claim that his plea was involuntary and unknowing, the post-conviction court found that Petitioner understood the plea and answered questions appropriately during the hearing.  It stated:

> You're [forty-two] years old.  You're intelligent.  I'm not going to accept an explanation from you that you didn't know what you were doing; that you didn't know what probation was; that you didn't know about the guns after we talked about it with you in court and went over it with you and you signed two documents. . . stating that from that point on you could not own or possess a firearm.

The post-conviction court found that Petitioner's plea was knowing and voluntary.  It denied the post-conviction petition.

*Order Denying Post-Conviction Relief*

In its written order denying post-conviction relief, the court detailed its oral findings and additionally found that the proof against Petitioner was very strong and that trial counsel had spoken to "virtually all the witnesses" involved in the incident.  It found that

trial counsel adequately explained Petitioner's options, thoroughly investigated Petitioner's case, and did not pressure Petitioner to accepting a plea offer.

The post-conviction court found that Petitioner's plea was knowing and voluntary and stated that trial counsel redirected Petitioner during the plea submission hearing when Petitioner focused on irrelevant issues. It stated that trial counsel "helped [P]etitioner to focus on the facts and not extraneous issues[.]"

Petitioner now timely appeals.

## **Analysis**

On appeal, Petitioner argues that he was denied the effective assistance of counsel and that his plea was unknowing and involuntary.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. *Id.* (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015).

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." *Fields*, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Id.* (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457.

### *Ineffective Assistance of Counsel*

Petitioner argues that he was denied the effective assistance of counsel because trial counsel failed to retrieve the 911 call recording from the night of the incident, failed to explain why Mrs. Godfrey would be "a terrible witness for the defense," failed to explain that a no contest plea would affect his right to carry a firearm pursuant to both state and federal law, failed to speak to Petitioner privately when the State offered a no contest plea in lieu of a guilty plea, failed to explain that his convictions could be used to enhance the punishment for any future convictions, and violated attorney-client privilege when trial

counsel reported Petitioner's harassment to the District Attorney and Petitioner's probation officer.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764,

- 14 -

at *4 (Tenn. Ct. Crim. App. April 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

Here, Petitioner lists a litany of complaints that he argues demonstrate trial counsel's ineffective assistance. However, he does not explain how these complaints were either deficient or prejudicial, nor does he cite to any authority to support his contentions.

First, Petitioner argues that trial counsel was ineffective for failing to subpoena the 911 recording on the night of the incident. Like the post-conviction court's analysis, our review of the recording transcript indicates that nothing in the recording would be of benefit to Petitioner and, in fact, would have harmed Petitioner if a jury heard it. We find no deficiency for trial counsel's clearly strategic decision not to subpoena the recording. *See Granderson*, 197 S.W.3d at 790.

Next, Petitioner complains that trial counsel did not explain why Mrs. Godfrey would be "a terrible witness for the defense." Trial counsel's testimony at the post-conviction hearing, which was accredited by the post-conviction court, was that Mrs. Godfrey told trial counsel that she was afraid of Petitioner and "what he would do." Trial counsel made a reasonable tactical decision not to want Mrs. Godfrey as a witness so that she would not establish an essential element of the offense – that Petitioner put the victim "in fear." *Id.*, Tenn. Code Ann. §§ 39-13-101(a)(2), -102 (2018).[3] The post-conviction court properly found that trial counsel thoroughly investigated Petitioner's case and interviewed Mrs. Godfrey, and the record does not preponderate against those findings.

Further, Petitioner's complaint that trial counsel was ineffective because he did not explain that owning a firearm would be against state law is baseless. Petitioner admitted at the post-conviction hearing that he understood that owning a firearm would be against federal law. Moreover, Petitioner indicated at the plea submission hearing that he understood that he would not be allowed to own a firearm, and he signed documents to that effect. The trial court explained at the plea submission hearing, "you're signing that you got notice that you know you cannot possess a firearm or it's a violation of the law." Even if Petitioner did not understand that owning a firearm would be against *state* law, he has not explained how that particular knowledge would have affected him in any way.

---

[3] The judgment forms do not appear in the record. The trial court stated during the plea submission hearing that Petitioner would be pleading to "aggravated domestic assault, a C felony." Thus, it appears that Petitioner was convicted of "intentional or knowing" aggravated assault. *See* Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii); (e)(1)(A)(ii) (2018).

- 15 -

Petitioner has not established deficiency or prejudice. *Goad*, 938 S.W.2d at 369-370; *Baxter*, 523 S.W.2d at 936. This issue is without merit.

Next, Petitioner argues that trial counsel "failed to stop the plea submission and take [Petitioner] aside to discuss the change in the agreement or ask for a reset after what occurred during the plea colloquy." This one sentence is the extent of Petitioner's argument; Petitioner does not explain why this was deficient or how this prejudiced him. The plea submission transcript shows that both trial counsel and the trial court explained a no contest plea and that Petitioner agreed to the no contest plea. Petitioner has not established deficiency or prejudice, and this issue is without merit. *Id*.

Further, Petitioner contends that trial counsel "failed to inform [Petitioner] that his plea could be used in the future to increase punishments for any future offenses." Again, this one sentence is the extent of Petitioner's argument. Petitioner testified that trial counsel failed to inform him that his plea could be used to increase future punishments, but the post-conviction court found that Petitioner's testimony was not credible. *Fields*, 40 S.W.3d at 456. Petitioner has failed to establish deficiency or prejudice. *Goad*, 938 S.W.2d at 369-370; *Baxter*, 523 S.W.2d at 936.

Finally, Petitioner argues that trial counsel breached attorney-client privilege when he called Petitioner's probation officer and the District Attorney General to report Petitioner's threatening and harassing behavior. While trial counsel testified regarding the issue of confidentiality, this issue was not raised in the post-conviction petition or amended petition and was not argued at the post-conviction hearing. Accordingly, the post-conviction court did not address this issue in its order denying post-conviction relief. Thus, this issue is waived, and Petitioner is not entitled to relief. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

*Unknowing and Involuntary Plea*

Petitioner argues that he was "pressured" by trial counsel to accept a plea. He asserts that he had no chance to privately ask questions of trial counsel and that he was unaware that a no contest plea had the same effect of a guilty plea. Petitioner contends that he did not verbally assent to accept the no contest plea.

The State responds that Petitioner is an intelligent, educated person who was familiar with criminal proceedings. It argues that trial counsel and the trial court fully explained the no contest plea and that Petitioner was aware of his available options. The State contends that Petitioner demonstrated understanding at the plea colloquy. It asserts that Petitioner's nodding assent of the plea, coupled with his expressions of understanding

- 16 -

during the colloquy and his signing of the plea agreement, establish that Petitioner knowingly and voluntarily accepted the plea agreement.

Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact *de novo* with a presumption of correctness. *Id.* The post-conviction court's findings of law are reviewed purely *de novo*. *Id.*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers*, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e. that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." *Id.* at 74.

Here, the *Blankenship* factors weigh heavily in favor of Petitioner's plea as knowing and voluntary. *See Blankenship*, 858 S.W.2d at 904. Petitioner testified that he had an Associate's degree and that he graduated with a 3.85 GPA. Petitioner had prior experiences with the criminal justice system due to his prior misdemeanor convictions. Trial counsel had twenty years' experience as a criminal defense attorney. The post-conviction court found that trial counsel "did a very good job" and was "very effective" in representing Petitioner. It determined that trial counsel "adequately explained alternative options" to Petitioner and that Petitioner understood the sentence he would be facing had he gone to trial. The record does not preponderate against the post-conviction court's findings. *Fields*, 40 S.W.3d at 458. We conclude that Petitioner's plea was knowing and voluntary, and Petitioner is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE